## [No. 3592.]

### P. M. WILSON *v.* THE STATE.

1. THREATS — CHARGE OF THE COURT.— Upon the subject of threats, the court in a murder trial charged the jury as follows: "And you are further instructed that you will not consider the testimony of such threats as the witness stated were not communicated to Wilson; and the questions for you to determine are these: Did Scott seriously make a threat to take Wilson's life? Was such threat communicated to Wilson before the killing? Was Scott, at the time of the killing, manifesting by some act then done an intention to execute the threats? If you are satisfied of these facts, you will

acquit?" *Held*, error, because it was immaterial to the defendant's right to act under the threats whether they were seriously made or not, if some act was done by the deceased, which, viewed in the light of the threats, rendered it reasonable for the defendant to infer that the deceased was about to execute his threats, and defendant did not know that the threats were not seriously made.

2. SAME — CONTINUANCE — NEW TRIAL.— A first continuance was sought to obtain the testimony of absent witnesses to prove other threats than those proved on the trial, and that they were communicated to the defendant. The application was sufficient as to diligence, but was refused by the court upon the ground that the desired testimony was cumulative. *Held*, first, that such reason can never apply to a first continuance; second, that the threats sought to be proved by the absent testimony were not the same testified to on the trial; and third, that the absent testimony being material and probably true, the court should have awarded a new trial.

3. JURY LAW — VERDICT — CASE STATED. — The defendant in a murder trial consented that a juror trying him should be allowed to separate from his associates upon the jury to participate as an actor in a dramatic performance, upon the express condition that he should be attended by the sheriff. The juror was absent from the panel an hour and a half, during which time, as he deposed, he was not talked to by any person concerning the trial. The condition, however, imposed by the defendant was violated. *Held* to vitiate the verdict.

APPEAL from the District Court of Bandera.    Tried below before the Hon. T. M. Paschal.

The indictment in this case was joint against the appellant and John Hellman, and charged them with the murder of John Scott, in Bandera county, Texas, on the 26th day of February, 1883.   The appellant being alone upon trial, he was convicted of murder in the second degree, and his punishment was assessed at a term of eight years in the penitentiary.

Nancy Scott, the wife of the deceased, was the first witness for the State.   She testified that, a few minutes before the fatal shot was fired, she heard loud talking out on the road near the house she was then in, and sent her sister out to see what it was about.   Her sister returned unable to tell, and then she went out herself to see. She went to a point within fifty or sixty yards of the place where the killing presently occurred.   She saw Hellman standing to the right and the defendant to the left of John Scott.   Scott presently turned his head towards Hellman, when the deceased fired his six-shooter, the ball lodging in Scott's head, entering behind.   Scott lived a quarter of an hour or more after he was shot, but never spoke.   Witness and Lucy Scott went to him when he fell.   Hellman and defendant had gone when witness and Lucy Scott reached the body.   Witness sent for Mr. Dunning and Mack Scott, who

arrived within thirty minutes, and, using a wagon, took the body of the deceased to the house of the witness's ,father. Hooper arrived at the body a few minutes after Mack Scott did. Deceased and witness were moving from the place in which they lived when the shooting occurred. Defendant, who owned the place, had, on the Saturday before the Monday of the killing, recovered the possession under process of law.

Cross-examined, the witness testified that the deceased was killed about one hundred yards from the house. Witness, at the time of the killing, was standing within fifty or sixty yards of the parties. The wagon, which was being driven by the deceased, was then west of the house. The river was between the house and the wagon. The wagon was southwest from where the witness stood. The parties were west from and nearly in front of the wagon. The vehicle was loaded with furniture. The witness heard loud talking, but could not distinguish the speakers nor what was said. They talked loud, but witness could not say that they cursed or called each other names. She was anxious on her husband's account because she thought the parties were quarreling. Witness knew the men were in the field, and she knew that the deceased was angry about the loss of the lawsuit, but she did not expect a difficulty. Witness had never before known of deceased having a difficulty. Deceased had a knife and pistol on his person, and appeared to be talking to Hellman when he was killed.

Re-examined, the witness stated that the knife worn by the deceased when he was killed was a round-pointed instrument. He was not in the habit of wearing a pistol, but had the pistol on that day, the witness having given it to him to take with the household goods to the place they were moving to. Witness did not see him draw or attempt to draw either the pistol or the knife, and she had a clear view of the parties from where she stood. Deceased and defendant had had trouble over the lawsuit for two weeks before the killing, but the deceased did not carry weapons during that time.

Miss Lucy P. Scott, the deceased's sister, was the next witness for the State. She testified, in substance, that in February, 1883, she lived with the deceased on the Medina river, in Bandera county. They were moving from that place when the killing occurred. A short time before the killing, Mrs. Hellman, the mother of John Hellman, was at the house. She offered to give the deceased an order on a party not present for $2 that she owed him. Deceased refused the order, and Mrs. Hellman abused him and left, and some thirty minutes later witness saw her going towards defendant's

house. It would have taken her ten minutes to go from the house then occupied by deceased to where witness saw her, if she went direct. Witness saw John Hellman go out of his field alone. Hellman and defendant were brothers-in-law. After a time the witness heard loud talking near the house, and at the request of Mrs. Scott she went out to ascertain the cause of it, but returned without having succeeded, and then she and Mrs. Scott went together, and saw the deceased, defendant and Hellman together, about one hundred yards from the house. Just as deceased seemed to turn to speak to Hellman, Wilson fired, shooting Scott in the back of the head, and he and Hellman fled. Witness went to the house for the camphor, and when she got to the body Mrs. Hellman was there. Scott lay on the ground with his feet in the public road.

Cross-examined, the witness testified that she and Mrs. Scott were about sixty yards distant from the parties when the fatal shot was fired, and could see them plainly. They could not be seen from the house because of intervening brush. The shot was fired just as witness and Mrs. Scott passed clear of the brush and stopped. One Hamilton was the man on whom Mrs. Hellman offered deceased the order for $2. Deceased did not owe Hamilton. Defendant owed Scott $4 for hunting hogs for him. Mrs. Hellman did not offer deceased an order on Wilson. The wagon was a large one, and had on it a large load of furniture. It stood between the witness and the parties at the time of the shooting, but as it was in a hollow or wash-out, and the men were on the rise of the hill beyond, witness could see them plainly. When witness got to the scene of the killing, she saw a pistol in its scabbard on the body of the deceased, and a hunting knife lying on the ground, near the body. Witness saw Mrs. Scott give the deceased the pistol to take off with the other things. The knife was a sharp pointed dirk. Mrs. Hellman picked the knife up from the ground.

Deputy Sheriff Hudspeth testified, for the State, that he learned of the homicide on the day that it occurred. He went to the houses of the defendant and Mrs. Hellman, and received information that directed him to Wight's cow camp at the head of the Medina river. He arrived there just before daylight, and found only Wight and his family in camp. He sent Wight out to bring the defendant in; which he did after two trips. Witness took a gun from Wilson, and found some clothing and provisions in a pair of saddle-bags, and was given a pistol by Wight.

Cross-examined, the witness said that he did not make himself known at Wight's camp until he had sent other men ahead. Defend-

ant's horse was in plain view when witness arrived at Wight's. The wallets, saddle and bridle were on the fence, and were not placed on the fence after the witness's arrival. Witness had no recollection of hearing defendant or Hellman say that they were going to Bandera to surrender, or that they were afraid to go to Bandera to surrender. Defendant and Hellman came to witness and surrendered, but witness could not remember that they gave any reasons why they did not come in the first time Wight went for them, except that they wanted to know who the parties after them were. Witness did not guard them extra closely, as he did not think they would try to get away. He told them they should have protection. Defendant said something about being afraid of Mack Scott, because of the killing of his brother. Deceased was an extra large man, and would weigh, one hundred and eighty pounds.

J. M. Scott testified that he found his brother, the deceased, lying in the road, shot through the back of the head. His head lay in his wife's lap. Witness, John Dunning and Hooper unloaded the wagon, placed deceased in it, and took him to his father-in-law's house, a mile away, where he died shortly afterwards.

John Hooper testified substantially as did J. M. Scott. Cross-examined, he described the topography of the country about the wagon, the body and the point where Mrs. Scott and Miss Lucy Scott said they stood, and expressed his opinion, without having made experiment, that a person standing where the ladies said they stood, could not have seen persons standing near the place where the body lay, if a loaded wagon stood between them.

Two witnesses for the State, who served on the jury of inquest, described the location of the wound near the top of the deceased's head. The State closed.

John Hellman was the first witness for the defense. He testified that while he was at work in his field on February 26, 1883, he heard loud talking between the defendant and the deceased, and went to see what was the matter. The two began fighting immediately after his arrival. Deceased thrust his hand under his coat, when defendant placed his in his pocket, and told deceased to stop. Deceased drew his hand from under his coat, and defendant removed his from his pocket. They began to quarrel again presently, and deceased again threw his hand under his coat, and the defendant thrust his in his pocket. Witness turned his head away, heard a pistol fire, looked around and saw deceased falling. Witness then caught defendant around the waist, pulled him, and told him to leave the place. From the place of the killing the defendant walked

up to the field where his horse was. Witness asked him what he was going to do, and he replied that he was going to give up. He then went up to his house, and thence to witness's house and got the witness's gun. He returned to a point near his house, where the witness joined him, and they talked for a short time. He then went off up a little hollow, and witness went back to the house. About this time Hooper came along, and witness told him that Wilson and Scott had fallen out and that Wilson had shot Scott. Not long after Hooper left, witness's mother came from the place of the shooting, and told witness that he had better get out of the way. Witness joined defendant and they went up to Wight's place, where they stayed that night, sleeping on the side of a hill near camp. Captain Hudspeth and others came to the camp about midnight, when defendant and witness surrendered.

Witness was within fifteen or twenty feet of the defendant and the deceased when they began fighting. Witness turned his head because he saw that the parties were going into an earnest fight, which he believed would terminate in one or the other being hurt, and he did not want to see it. The deceased fell rather towards defendant, and as he fell the defendant struck him on the jaw with his pistol. Deceased was a much larger man than the defendant, weighing, in the opinion of the witness, about one hundred and seventy pounds. The defendant would weigh about one hundred and twenty-five or thirty pounds. Witness and defendant went to Wight's camp to stay until the anticipated excitement should subside. Witness was apprehensive that the father and brother of the deceased would kill him, and thought well of defendant's suggestion to retire to Wight's camp until the excitement quieted down, before surrendering. Witness and defendant surrendered to Captain Hudspeth, and were not taken by force of arms. They were informed by Wight of the *personnel* of Captain Hudspeth's party, and surrendered, together with their horses, gun, pistol, meat, coffee and bread. In traveling the road from where witness and defendant lived to Bandera, it was necessary to pass the house Scott lived in.

Cross-examined, the witness testified that he was a hundred yards distant from the parties in the field when he first heard the quarrel. He was within fifteen or twenty feet of the parties when deceased thrust his hand under his coat the first time, and defendant told him to stop. Witness could not say how long he was in going from the field to the point where the parties were. He had no particular reason for going except that he wanted to ascertain what the parties were quarreling about. He caught the defendant around the waist, as stated, because he thought Scott was hurt. Defendant

was then standing with his left arm extended and his pistol in his right hand, and witness did not know what else he might do, as he, defendant, was mad. Witness did not see the defendant when the latter went to the place where he shot the deceased. It was the impression of the witness that Scott was cursing the defendant, but witness did not know what about. It was the impression of the witness that deceased was in debt to defendant upon an original account between them, and upon an account which defendant bought from another person, and it was the opinion of the witness that the quarrel grew out of an attempted settlement. The shooting occurred at a point distant at least a half mile from Scott's house. Witness and defendant did not go themselves to see if Hudspeth had papers before they surrendered, because they thought it best for Wight to find that matter out. Witness knew of the enmity existing between Scott and Wilson, and did not care to interfere for either party. Witness advised them to quit quarreling, but, as no one was there to help him, he made no effort to stop them.

L. L. Wight testified, for the defense, that defendant and Hellman reached his camp on the head waters of the Medina a little after nightfall, and defendant told witness that he had that day shot and killed Scott. He gave no particular reason for coming to witness's camp, but appeared to wish advice from witness. Witness advised him to surrender, and he said that he thought that course the best. The defendant and Hellman did not run away from the camp when Hudspeth and his posse arrived, but were already a short distance from the camp,— about ten steps,— having retired to that point because the camp was not roomy enough for their accommodation. Witness went to them after Hudspeth's arrival, and they directed him to ask Hudspeth some questions. Witness did so and returned, and they went back with witness and surrendered. Witness accompanied the posse with the prisoners next day, and was one of the jury of inquest. Witness probed the wound on deceased's head with a stick. The ball entered on the left side of the head near the top and a little in front of a median line drawn from the front to the back of the head. If the ball had come out, the place of its exit would have been lower than the place of its entrance. "I first thought the ball entered the back of the head, and was led to think so because the blood had run from the wound which I afterwards found, and settled on the back of the head. The head was on a feather pillow, and from the blood on the pillow I inferred the wound was in the back of the head, until I raised the head, parted the hair and found the wound."

William Hinds testified, for the defense, that he was on the cor-

oner's jury. He described the wound, and expressed his opinion that such a wound could not have been inflicted from behind.

J. B. Clawson testified, for the defense, that on one occasion shortly before the killing, while he and Louis Polk were surveying land, the deceased came up to them. Witness, speaking to deceased, said: "The line of the land you got from Wilson does not run where you said it did; your land does not take in the valley on which you have been cutting timber." The deceased replied: "I don't care a d—n. Wilson won't want but six feet of ground when I get through with him." Witness repeated this to defendant, and advised him to be on his guard, before the killing. He also told defendant before the killing that about the time of the lawsuit he heard the deceased say, in Sheppard's store, that he, deceased, would kill the "G—d d—d hog-thieving son-of-a-b—h," meaning the defendant.

Cross-examined, the witness testified that the first conversation alluded to took place late in the evening on or about February 1, 1883, at a point about one hundred yards distant from witness's house, and in the presence of Louis Polk. Polk was present to plat the land and settle a controversy about boundary lines. Deceased claimed that a certain line ran two hundred yards from where it really ran, and had cut timber on the land it embraced. This conversation occurred a week or more after the Wilson-Scott land suit was decided.

Louis Polk testified that he was present on the occasion referred to by Clawson, and heard deceased make the threat repeated by Clawson.

W. M. Young testified, for the defense, that he was present at Plunk Sheppard's store and heard deceased say, referring to defendant, that he would "kill the G—d d—d hog-stealing son-of-a-b—h before he got through with him." This was on the day of the land suit between deceased and defendant. Witness did not tell defendant of this threat, nor did he know that any one else did. Sheppard and others were present, and near enough to hear what was said by deceased. The killing of Scott did not occur on the first Monday after the land suit, but on the second or third Monday thereafter.

The opinion of the court indicates the character of the absent testimony, for which a continuance was sought, and discusses the questions raised by the motion for new trial.

No brief for appellant has reached the Reporters.

*J. H. Burts,* Assistant Attorney-General, for the State.

Hurt, Judge.   John Hellman and appellant P. M. Wilson were jointly indicted for the murder of John Scott.   At the April term of the district court of Bandera county Wilson was tried and convicted of murder in the second degree, his punishment being assessed at confinement in the penitentiary for eight years.

The wife and sister of Scott, the deceased, were some sixty yards from the place of the killing, and not in a very favorable position to see just what occurred at the time.   They saw, however, that Scott seemed to be talking to Hellman when Wilson shot him from the rear in the back of the head.   These witnesses were not in ear-shot of the parties, and could not hear what passed between them. Scott fell when shot, and by his side a dirk hunting knife was found.

There was no other witness to the homicide except Hellman. The indictment, as against him, we suppose, was *nolle prossed*, for he was introduced as a witness for defendant, and testified, in substance, that he was in the field at work and heard talking, went to the parties, and just after getting to them Scott ran his hand under his coat, and Wilson put his hand in his pocket and told Scott to stop.   Scott took his hand from under his coat, and Wilson took his hand out of his pocket.   The parties then commenced to quarrel again, and Scott ran his hand under his coat again, and Wilson ran his hand into his pocket again.   The witness turned his head away, and immediately the pistol fired.   Hellman was about fifteen or twenty feet from the parties.   Scott fell towards Wilson, and while falling Wilson struck him with his pistol.   Scott weighed about one hundred and seventy pounds, and Wilson about one hundred and thirty.

Defendant proved threats by Scott to kill him, etc., which were communicated to him.   Upon this phase of the case the court charged the jury as follows:   "And you are further instructed that you will not consider the testimony of such threats as the witness stated were not communicated to Wilson, and the questions for you to determine are these: Did Scott seriously make a threat to take Wilson's life.   2d. Was such threat communicated to Wilson before the killing; and 3d, was Scott at the time of the killing manifesting by some act then done an intention to execute the threats.   If you are satisfied of these facts you will acquit."

Now, whether the threats were seriously made or not has nothing whatever to do with defendant's right to act under them if some act was done, viewed in the light of the threats, which rendered it reasonable for defendant to infer that Scott was about to execute

his threats. This proposition is correct unless Wilson knew that the threats were not seriously made. There is no evidence that the witnesses who informed him of the threats also informed him that they were not made seriously, and the natural presumption would be that they were seriously made. This would arise from the nature of the threats themselves, and the further fact that his neighbors thought it prudent that he should be aware of them.

Appellant moved that the cause be continued for the want of the testimony of several witnesses by whom he states that he can prove other threats made by Scott to take his life, and that they were communicated to him before the homicide. This was his first application. There is no question as to diligence. The court denied the motion and he excepted.

The reason assigned by the learned judge below for refusing the application was that the evidence is cumulative. This reason can never apply to the first application for a continuance. The defendant has the right to prove a material fact by any number of witnesses, within the bounds of reason. And again, these threats were not made at the same time and place, and in the presence of the same persons. We think a new trial should have been granted because this evidence was material and probably true.

Pending the trial, and after the case had been submitted to the jury, it appears from the record that a dramatic performance came off in the town of Bandera; that it was agreed by defendant that a certain juror should attend and take part as an actor in this performance; and that said juror did, in pursuance of this agreement, leave the panel for one or one and a half hours; that no person, as is sworn to by the juror, spoke to him of the case. Counsel for the defendant consented to this matter upon the express agreement that the sheriff should accompany the juror, which was not done.

Appellant brought this matter forward in his motion for a new trial, and now insists that the court should have granted his motion because of the same. It will be borne in mind that the defendant consented to this separation upon the express condition that the sheriff should attend the juror. This being the case, and this part of the agreement being violated by the sheriff, this separation will be treated as without the consent of the defendant, and, viewing it in that light, we have no hesitation, in view of the authorities, in holding that it was such irregularity as will vitiate the verdict. (See these authorities: Code Crim. Proc., arts. 687 and 689; *Early* v. *The State*, 1 Texas Ct. App., 248; *Wright* v. *The State*, 17 Texas Ct. App., 152; *Jones* v. *The State*, 68 Mich., 760; *Connor* v. *Worms-*

*ley,* 8 Gratt. (Va.); 712; *Duval* v. *The State,* 56 Ga., 653; *Wood* v. *The State,* 34 Ark., 311; 40 Ala., 454.)

For the errors above indicated the judgment is reversed and the cause remanded.

*Reversed and remanded.*

[Opinion delivered June 24, 1885.]